**2022 UT App 132**

## THE UTAH COURT OF APPEALS

RACHEL BOWERS,
Appellant,
*v.*
DUSTIN BURKHART,
Appellee.

Opinion
No. 20210276-CA
Filed November 25, 2022

Fourth District Court, Provo Department
The Honorable Robert A. Lund
No. 194403198

Emily Adams and Sara Pfrommer, Attorneys
for Appellant

Julie J. Nelson, Taylor Webb, and
Melissa A. Patten-Greene, Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

TENNEY, Judge:

¶1     Rachel Bowers and Dustin Burkhart divorced before their daughter (Daughter) was born. When Daughter was born, Bowers gave her the surname Bowers. But Burkhart later moved to change Daughter's surname to Burkhart. After a hearing, the district court granted Burkhart's motion, finding that it was in Daughter's "best interest to change her last name to Burkhart." Bowers now challenges the court's decision on appeal, contending that it was "based on speculation and not on evidence." We agree and reverse.

BACKGROUND

¶2    Bowers and Burkhart married in September 2018. Throughout their marriage, Bowers used her own surname and did not use the surname Burkhart.

¶3    In July 2019, Bowers learned that she was pregnant. In August 2019, Bowers and Burkhart separated, and in November 2019, they signed and submitted a stipulated divorce decree. Although they both knew of Bowers's pregnancy, they claimed in the stipulation that they were "not expecting a child." The divorce was finalized in January 2020, and Daughter was born in February 2020. Burkhart was living out of state at the time and was not present at Daughter's birth, nor was he listed on Daughter's birth certificate. At Daughter's birth, Bowers gave her the surname Bowers.

¶4    Six months after Daughter's birth, Burkhart filed a petition for paternity. In his petition, Burkhart asserted that he had not met Daughter because Bowers refused to communicate with him. He also claimed that although he "signed all the divorce documents," Bowers was the one who completed them and he "did not thoroughly review or understand what they said." He further claimed that he didn't know why Bowers "erroneously filled out the divorce documents stating that the parties '[were] not expecting a child together.'" Finally, Burkhart requested that Daughter's surname be changed to Burkhart and that he be listed as her father on her birth certificate.

¶5    In December 2020, the parties filed a stipulation to amend their divorce decree and resolve Daughter's paternity. But the parties did not reach an agreement on Daughter's name, so they reserved that issue. Based on this stipulation, the district court amended the divorce decree and resolved paternity. The court gave Bowers sole physical custody of Daughter, established dates for Burkhart to have supervised parent-time, and created a visitation schedule for Burkhart that would start after he completed a drug test, an anger management course, and a

parenting course. The court also ordered Burkhart to pay child support (including an arrearage of $5,053) and ordered that Burkhart be listed on the birth certificate. The court reserved the issue of Daughter's surname and stated that either party could "set a hearing" on that issue.

¶6      After the parties filed their stipulation, Burkhart moved to change Daughter's surname to Burkhart.[1] At the time, Daughter was nine months old. In his motion, Burkhart alleged that Bowers gave Daughter a different first name "than the parties had previously discussed and agreed upon and name[d] the minor child her maiden name" rather than Burkhart's last name. Burkhart explained that he "has no other minor children and feels very strongly that the minor child should have his last name." Burkhart claimed that he "has fought very hard to establish and create a relationship with the minor child and wants to have a very long term close and loving bond with her." And Burkhart further argued that Daughter "should have his last name for religious, genealogy, and family ties."

¶7      Burkhart also noted that Bowers has four other children, none of whom bear the surname Bowers. From this, Burkhart argued that Bowers "is used to having a different last name [than] her minor children." Moreover, Burkhart contended that Bowers "has resisted and delayed" his relationship with Daughter and that he "worries that [Bowers] seeks to undermine or diminish the importance of his role in [Daughter's] life, including by refusing to allow [Daughter] to have and use his last name."

¶8      Burkhart did not include a declaration, an affidavit, or other evidence with this motion. But the final page of the motion included a heading titled "Authentication" under which appears this sentence: "I declare under criminal penalty under the law of Utah that the foregoing is true and correct." There was then a typed signature for Burkhart, with the explanation that his

---

1. This motion was filed as part of the divorce case, but the paternity case and the divorce case were later consolidated.

"signature [was] affixed by counsel with permission given via e-mail."

¶9      Bowers opposed Burkhart's motion. In support of her opposition, she attached her own sworn declaration in which she explained the parties' history. There, Bowers averred that Burkhart told her during her pregnancy "that he hoped [she] had a miscarriage and that it was a misfortune [she] was pregnant." She said that Burkhart "consistently reminded [her] that he did not want the baby" and "declined [her] invitations to attend doctor appointments." But she did acknowledge that Burkhart nevertheless "expressed a desire that [Daughter] have his last name, Burkhart."

¶10     Contrary to Burkhart's assertion, Bowers averred that Daughter was not mentioned in their stipulated divorce decree because Burkhart "had repeatedly expressed his intention to have nothing to do with the child." Bowers also averred that although Daughter was born in February, Burkhart "made no effort to contact [Bowers] about [Daughter] or visit her until August 2020." Bowers said that Burkhart tried to visit in August but that she had called the police because he arrived without warning at 11:00 p.m. and Bowers was afraid of him.

¶11     Bowers also explained how Burkhart had behaved during supervised parent-time. For example, she claimed that Burkhart called Daughter a "boober," a nickname that he used with Bowers's "other children during [their] marriage and [that] carries a negative connotation." She also stated that he held Daughter "upside down for a period of time until she made noises indicating she was uncomfortable." Bowers claimed that Burkhart had paid "zero" child support. Finally, in her memorandum opposing Burkhart's motion, Bowers contended that she was not impeding Burkhart's relationship with Daughter, but, rather, that it was Burkhart's "instability, anger issues, lack of parenting skills, drug issues, and failure to exercise parent time" that was impeding his relationship with Daughter.

¶12    In his reply, Burkhart contended that he "called and texted [Bowers] daily and then two to three times per week to talk to her and ask her about [Daughter]," but that "[Bowers] never responded." Burkhart also denied that "he has ever had a drug problem" or that he had behaved inappropriately around Daughter during the supervised parent-time. Burkhart further argued that it was in Daughter's best interest to have his name because, although he "does not know if [Bowers] will get married again and/or change her name in the future," "obviously his name shall remain the same and a constant for the minor child." And he claimed that, given Bowers's "clear resistance" to him, it was "important that [Daughter] have his last name to help develop and preserve" her "relationship with him." Burkhart attached two exhibits to his reply: (1) lab results showing that he had recently tested negative for illegal drug use, and (2) a certificate showing he completed an anger management course.

¶13    The court held a hearing on the motion. There, both parties agreed that the relevant legal question was whether a name change was in Daughter's best interest. Both sides also suggested that the court's best interest analysis should be guided by the factors outlined in *Hamby v. Jacobson*, under which a court may consider (1) "the child's preference in light of the child's age and experience"; (2) "the effect of a name change on the development and preservation of the child's relationship with each parent"; (3) "the length of time a child has used a name"; (4) "the difficulties, harassment or embarrassment a child may experience from bearing the present or proposed name"; and (5) "the possibility that a different name may cause insecurity and lack of identity." 769 P.2d 273, 277 (Utah Ct. App. 1989).

¶14    Burkhart's attorney emphasized that Burkhart "has been begging through this entire period of time to get to know this child, to be introduced to this child." But Bowers's attorney reminded the court that Burkhart, as the movant, bore the burden of proof. She also said that Bowers is a military veteran who served for eleven years and has a bronze star and a purple heart, that Bowers has a multi-generational military legacy, and that

Bowers wanted Daughter to have her surname because she believes that Daughter "will be proud of that name and the legacy that survives that name."

¶15    After argument, the court determined that it was in Daughter's "best interest to change her last name to Burkhart" and thus granted Burkhart's motion. In a written order, the court started by explaining that it "heard conflicting representations made by the parties regarding the history of this matter and events in the past." The court accordingly made "no findings in regard to such because there is no evidence in the record to support either parties' representations." And while it thanked Bowers for her military service, it also found that her military service was irrelevant to the question before it.

¶16    Turning to the *Hamby* factors, the court first found that Daughter's preference and the length of time that Daughter had the Bowers surname were irrelevant because of Daughter's young age. The court then explained that "a key factor" in its analysis was "the effect a name change could have on the development and preservation of the child's relationship with each parent." Regarding this factor, the court found that Bowers "has been the primary caretaker of the minor child and the minor child's surname will not likely impact the development and preservation of [Bowers's] relationship with the minor child." But the court "conversely" found that giving Daughter Burkhart's "surname will likely encourage [Burkhart] and [Daughter's] bond and encourage [Burkhart] to participate, stay involved with [Daughter], pay child support, and help raise [Daughter]."

¶17    The court next considered "whether there could be difficulties, harassment, or embarrassment the minor child may experience from bearing the present or proposed name." The court stated:

> Whether there is a misogynistic bias, the Court
> recognizes the cultural norm in the United States
> and  around  the  world  that  children  bear  the

> paternal surname. This fact is relevant here only so far as the practice of giving the minor child their father's last name is the norm in this child's family. [Bowers] has given her other minor children their fathers['] last names and not doing so with this minor child may cause difficulty, harassment and/or embarrassment as to why she is the only child not given her father's last name in this family because it raises the issue of illegitimacy. Therefore, this factor cuts strongly in favor of [Burkhart].

The court thus found "the possibility that a different last name may cause the minor child insecurity and lack of identity compelling in this case." It further found that Daughter "is more likely to have a strong sense of security and identity of who she is on both sides of her family if she is give[n] [Burkhart's] last name and lives full time with [Bowers]." And finally, the court found that Bowers's "motives or interests are contrary to her position and actions regarding the naming of her other children." From this, the court expressed its "concern[ ] that her motive is just to be contrarian."

¶18   Based on these findings, the court concluded that Burkhart "met his burden and it is in the minor child's best interest to change her last name to Burkhart." Bowers now appeals that decision.

ISSUE AND STANDARD OF REVIEW

¶19   Bowers argues that the court erred when it determined that it was in Daughter's best interest to change her surname to Burkhart. "[A]scertaining the best interests of a child is a factual, not a legal, determination." *Hamby v. Jacobson*, 769 P.2d 273, 278 (Utah Ct. App. 1989). We accordingly review the district court's "findings under a clearly erroneous standard and will not disturb those findings unless they are against the clear weight of the

evidence, or if [we] otherwise reach[] a definite and firm conviction that a mistake has been made." *Id.* at 279. Importantly, "when the evidence consists only of proffers to the [district] court," we are "in as good a position to review the proffer as was the [district] court, as no assessment of witness credibility occurred below. Therefore, we review the facts and draw our own legal conclusions therefrom." *Id.* at 278 (quotation simplified).[2]

## ANALYSIS

¶20    We begin our analysis by explaining the governing law, namely the best interest analysis and the factors laid out in *Hamby*

---

2. As noted, we held in *Hamby v. Jacobson*, 769 P.2d 273, 278 (Utah Ct. App. 1989), that the best interest determination in a contested name-change dispute involves a "factual, not a legal, determination," and subsequent cases involving similar disputes have applied the accompanying standard of review. *See, e.g., Velasquez v. Chavez*, 2019 UT App 185, ¶ 9, 455 P.3d 95; *Christensen v. Christensen*, 941 P.2d 622, 624 (Utah Ct. App. 1997). Both parties here have accordingly agreed that the question before us involves a question of fact.

    We note that in a recent decision, our supreme court reconsidered the nature of a best interest determination (albeit as applied to a different kind of decision). The court held that a best interest determination does not involve "a pure finding of fact" but instead involves a "'fact-like' mixed question subject to deferential review." *In re E.R.*, 2021 UT 36, ¶¶ 17, 22, 496 P.3d 58. The parties have not briefed the potential implications of this apparent shift in the standard of review to this case. In any event, we would reach the same conclusions under this modified standard of review. As discussed below, we see insufficient support for the factual components of the court's ruling. And to the extent that any of the analysis below is more appropriately regarded as being legal in nature, our conclusions would be the same.

*v. Jacobson*, 769 P.2d 273 (Utah Ct. App. 1989). We then apply that law to the case before us.

A.     The Best Interest Analysis and the *Hamby* Factors

¶21     When a court considers whether a child's name should be changed, "the paramount consideration" is the best interest of the child. *Id.* at 277. The best interest analysis presents a familiar inquiry. For example, a court can terminate parental rights only after determining that doing so is in the child's best interest. *See In re Z.C.W.*, 2021 UT App 98, ¶ 10, 500 P.3d 94; *see also* Utah Code Ann. § 80-4-104(12)(a) (LexisNexis Supp. 2022). Similarly, "in all custody determinations, the district court's primary focus must be on the best interests of the child." *Pingree v. Pingree*, 2015 UT App 302, ¶ 7, 365 P.3d 713 (quotation simplified); *see also* Utah Code Ann. § 30-3-10(2) (LexisNexis 2019).

¶22     The best interest analysis commonly includes a consideration of how best to promote continuity in the child's life. This is because "[c]hildren have an interest in permanency and stability." *In re K.C.*, 2015 UT 92, ¶ 27, 362 P.3d 1248. Stability is important because it "makes possible the psychological and emotional security that underlies a child's well-developed sense of self-worth and self-confidence." *Elmer v. Elmer*, 776 P.2d 599, 604 (Utah 1989).

¶23     The importance of stability perhaps arises most often in the context of custody determinations, but it has some bearing on a name-change determination too. To state the obvious: a person's name is a key component of his or her identity. Because of this, when parents come to court and argue about whether a child's name should be changed, the court should recognize that changing the child's name may well create some instability for the child. Beyond the identity implications, changing the child's name might also create practical instability, such as by setting the stage for inadvertent confusion or mistakes in the child's government, education, or health records.

¶24    In past cases, we have not explicitly stated which parent bears the burden of proof in a contested name-change case. But we have at least implicitly placed the burden on the parent who is moving to change the child's name. *See, e.g.*, *Christensen v. Christensen*, 941 P.2d 622, 626 (Utah Ct. App. 1997) (holding that it was "incumbent upon the appellant," who was the moving party, "to go forward with the evidence and show that the name change is in the best interest of the child" (quotation simplified)). In light of the stability interest discussed above, we take this opportunity to make explicit what has been implicit before: the parent who is moving to change a child's name bears the burden. And we further emphasize here that this requires that parent to establish that the name *change* is in the child's best interest, as opposed to simply establishing that the moving parent's preferred name is a good one on its own. *See Velasquez v. Chavez*, 2019 UT App 185, ¶ 16, 455 P.3d 95 (holding that the "district court did not err in determining that it was in the child's best interest to *change* his surname" (emphasis added)).

¶25    Placing the burden on the parent requesting the change fosters stability by ensuring that the child's name will not change without affirmative proof that the requested change is in the child's best interest. *See Burden of proof*, Black's Law Dictionary (11th ed. 2019) (defining "burden of proof" as a "party's duty to prove a disputed assertion or charge"). And placing the burden on the parent seeking to change the child's name is also consistent with our legal norms, which typically place the burden on the moving party. *See Trapnell & Assocs., LLC v. Legacy Resorts, LLC*, 2020 UT 44, ¶ 56, 469 P.3d 989 ("A motion implies a burden that a party must meet to be awarded the relief it seeks. It contemplates that a party will forward legal and factual support so the court can evaluate whether it is entitled to what it moves to receive."). Indeed, we note that the courts of several states have explicitly placed the burden on the moving parent in this very context for similar reasons. *See, e.g.*, *Bowman v. Hutto*, 269 So. 3d 596, 597 (Fla. Dist. Ct. App. 2019) (per curiam) ("The proponent of the name change carries the burden of proof, and conclusory assertions are insufficient."); *Mazzone v. Miles*, 532 S.E.2d 890, 893 (S.C. Ct. App.

2000) ("The parent seeking to change the child's surname has the burden of proving that the change will further the child's best interests."); *Barabas v. Rogers*, 868 S.W.2d 283, 285 (Tenn. Ct. App. 1993) ("Parties seeking to change a child's surname bear the burden . . . .").[3]

¶26   We have previously articulated a set of factors that are designed to aid courts in determining whether a parent has shown that a name change would be in the child's best interest. *See Hamby*, 769 P.2d at 277. As noted earlier, we suggested in *Hamby* that courts may consider (1) "the child's preference in light of the child's age and experience"; (2) "the effect of a name change on the development and preservation of the child's relationship with each parent"; (3) "the length of time a child has used a name"; (4) "the difficulties, harassment or embarrassment a child may experience from bearing the present or proposed name"; and (5) "the possibility that a different name may cause insecurity and lack of identity." *Id.*

¶27   But we also recognized that other factors "may be relevant" and "that courts should apply only those factors present in the particular circumstances of each case." *Id.* We again express this same sentiment. These factors are useful and should commonly guide a court's analysis, but the ultimate question is whether the name change is in the child's best interest. *See id.* A court considering a motion to change a child's name should accordingly consider all relevant facts. *See id.* at 278. Depending on the circumstances, this may mean that certain *Hamby* factors are irrelevant, and it may also mean that certain factors not listed in *Hamby* are relevant or even dispositive. As suggested by the supreme court regarding another test in another context, we conclude here that the *Hamby* factors "should be considered when relevant, ignored when not, and given appropriate weight

---

3. At oral argument, Burkhart conceded that he bore the burden on this motion.

according to the circumstances." *State v. Fullerton*, 2018 UT 49, ¶ 23, 428 P.3d 1052.

¶28    In short, the ultimate question is whether changing the child's name to the proposed name is in the child's best interest. *See Hamby*, 769 P.2d at 277. A court making that determination must consider all legally relevant facts. *See id.* And the parent requesting the name change bears the burden of proving that the change itself is in the child's best interest.

### B.    Sufficiency of the Evidence in this Case

¶29    Having laid out the legal framework, we turn to the district court's determination that it was in Daughter's best interest to have her surname changed to Burkhart. We first begin by clarifying the universe of relevant facts. We then review the court's best interest determination.

### 1.    Relevant Facts

¶30    Because the best interest analysis is a factual determination, we must first determine what facts were appropriate for the court to consider. Bowers argues that although Burkhart's motion was "authenticated," it was unsupported "by a declaration or affidavit or any other evidence." Burkhart, however, argues that his authenticated motion should be treated as an affidavit under *Pentecost v. Harward*, 699 P.2d 696 (Utah 1985).[4]

¶31    In *Pentecost*, our supreme court held that "[a] verified *pleading*, made under oath and meeting the requirements for affidavits established in Rule 56(e) of the Utah Rules of Civil Procedure, can be considered the equivalent of an affidavit for

---

4. Although Burkhart included an "authentication" section with his motion, he points to no rule or case indicating that courts recognize such motions, let alone any rule or case establishing what legal effect an "authenticated" motion is supposed to have.

purposes of a motion for summary judgment." *Id.* at 698 (emphasis added). But a motion is not a pleading. *See* Utah R. Civ. P. 7 (grouping "Pleadings" and "Motions" separately). As a result, we have some doubt about whether the process laid out in *Pentecost*—which allows a "verified pleading" to "be considered the equivalent of an affidavit," 699 P.2d at 698—is actually applicable here. Moreover, extending the *Pentecost* rule to Burkhart's particular motion may also be problematic from a practical perspective. Burkhart's motion made no effort to distinguish between his purportedly authenticated facts and his legal arguments, and the two often blended together. As a result, it's difficult to know which parts are supposed to be treated as affidavit-equivalent and which parts are instead supposed to be treated as legal argument.

¶32 But we ultimately need not resolve this here. This is so because, even if we do consider Burkhart's motion to be the equivalent of an affidavit (and, thus, evidence), we are persuaded that the court's findings that were derived from it were "against the clear weight of the evidence." *Hamby*, 769 P.2d at 279.

2. District Court's Findings

¶33 The district court considered four of the *Hamby* factors and concluded that each of them weighed in favor of changing Daughter's surname to Burkhart. We address the court's assessment of each identified factor in turn.[5]

a. Effect of Name Change on Parental Relationship

¶34 The court found that "a key factor" was "the effect a name change could have on the development and preservation of the child's relationship with each parent." The court then concluded

---

5. Bowers does not contest the district court's determination that Daughter's young age makes both her preference and the length of time she has used the surname Bowers irrelevant to this case. We accordingly do not consider those factors.

that because Bowers is the "primary caretaker," the relationship between Bowers and Daughter will not likely be impacted by Daughter's surname. Conversely, the court found that giving Daughter the surname Burkhart would "encourage [Burkhart] and [Daughter's] bond and encourage [Burkhart] to participate, stay involved with [Daughter], pay child support, and help raise [Daughter]." The court accordingly found that it was in Daughter's best interest to have the surname Burkhart because it would "help both parties be invested" and "involved in her life."

¶35  But this finding was not supported by reference to any particular evidence about Burkhart's relationship with Daughter. Rather, it seems to have been based on the court's reasoning that because Burkhart was the noncustodial parent, his relationship with Daughter stood to benefit the most from sharing a surname with Daughter. So viewed, we see two problems with this determination.

¶36  First, the court's reasoning effectively created a presumption in favor of Burkhart because he's the noncustodial parent. But in *Hamby*, we were "unwilling to adopt a presumption in favor of the choice of the custodial parent," instead concluding that the broader "best interests of the child test" essentially accounts for the "custodial situation of the child" on a case-specific basis. *Hamby*, 769 P.2d at 277. We likewise conclude here that there should be no presumption in favor of the noncustodial parent. Noncustodial parents could virtually always make the argument that Burkhart makes and which was accepted by the district court: that a child's name should be used as some sort of counterbalance for a lesser amount of custody, or, perhaps even further, that the child's name should be used to foster that relationship and incentivize good parenting behavior moving forward.

¶37  But we're less convinced than the district court was that the child's name has much bearing on whether a parent and the child will have a loving relationship. Here, for example, Burkhart will be Daughter's father with or without a shared

name, and it's his paternal relationship to her, not their respective names, that should drive his love, care, and support for her. As aptly recognized by the Oregon Court of Appeals in another father-daughter case, the "development of a bond between father and daughter will depend on the love and devotion that father exhibits toward his daughter, not on whether the child bears his name." *Doherty v. Wizner*, 150 P.3d 456, 465 (Or. Ct. App. 2006). And in any event, to the extent that sharing a name with a child might somehow be said to improve a parent's relationship with that child, we see no reason why one parent should be given a presumptive legal advantage in that respect over the other.

¶38    To the extent that the district court's ruling was intended to use Daughter's name as an incentive for good parenting behavior by Burkhart moving forward, we thus regard that approach as problematic. Once Daughter's name was changed, that change would now be a *fait accompli*. But at that point, there would be no guarantee that Burkhart actually would engage in good parenting as a result of the shared name, and even if he did, his behavior could then regress at any time without depriving him of that already-enshrined benefit. As far as incentives go, this one is decidedly weak, as evidenced by the fact that our courts are unfortunately and yet all-too-commonly confronted with cases in which parents fail to fulfil their parental obligations despite sharing a surname with their children.

¶39    We therefore agree with Bowers that "[n]aming privileges" should not be "a carrot to be dangled in front of a [parent] to encourage good behavior." Burkhart has a legal obligation to support Daughter because she's his daughter. *See* Utah Code Ann. § 78B-12-105(1) (LexisNexis 2018) ("Every child is presumed to be in need of the support of the child's mother and father. Every mother and father shall support their children."). Burkhart should pay his support obligations because he's legally and morally required to do so, not because a court previously gave Daughter his surname. So too with all other obligations of good parenting.

¶40   Second, the district court also failed to cite any evidence to support its finding that changing Daughter's surname would "encourage [Burkhart] to participate, stay involved with [Daughter], pay child support, and help raise [Daughter]." And our review of Burkhart's motion reveals no such evidence either. In his motion, Burkhart asserted that Bowers has "resisted and delayed" his relationship with Daughter and that changing Daughter's surname to Burkhart would "preserve his role as co-parent in her childhood and life." But if Bowers is indeed preventing Burkhart from spending time with Daughter, Burkhart's recourse is to exercise his rights to parent-time that are provided in the amended divorce decree and, if necessary, to seek aid on that front from the courts. Burkhart has never explained why Daughter's surname impacts that ability.

¶41   As for Burkhart's other arguments about this factor, we note that Burkhart argued below that no "harm [or] difficulties will be incurred by ordering [Bowers] to amend [Daughter's] birth certificate to his last name." But as explained above, Burkhart was the parent attempting to change Daughter's name, so he bore the burden of proof, not Bowers. In other words, it wasn't incumbent on Bowers to establish that it would be good to keep Daughter's name as is; rather, it was incumbent on Burkhart to establish that it was in Daughter's best interest to have her name changed.

¶42   On appeal, Burkhart points us to *Velasquez v. Chavez*, 2019 UT App 185, 455 P.3d 95, for the proposition that a child's surname is important for "developing bonds with the non-custodial parent, particularly where the child lives in a blended family." But unlike Burkhart, the father in *Velasquez* presented evidence to support his motion to change his child's name. Specifically, the *Velasquez* father presented evidence that his son called his stepfather "daddy." *Id.* ¶ 4. In light of this fact, the district court then changed the child's surname from the mother's surname to a hyphenated name that included both the father's and the mother's surnames. *Id.* ¶ 8. On appeal, we affirmed that name change, relying in part on the district court's finding that

the hyphenated name would help the child "understand the difference between stepfather and natural father." *Id.* ¶ 12 (quotation simplified). Conversely, Burkhart has not presented evidence that Daughter is or will be confused about who her biological father is without the name change.

¶43    Burkhart also points us to *Christensen v. Christensen*, 941 P.2d 622 (Utah Ct. App. 1997). In that case, the child bore her noncustodial father's surname, and the custodial mother was the moving party. *See id.* at 623. The district court denied the mother's motion and ordered that the child continue to use her father's surname. *See id.* at 624. We affirmed on appeal, relying in part on the district court's finding that a name change could "negatively impact" the father-child relationship because the father lived out of state and the mother had interfered with his visitation. *Id.* at 625 (quotation simplified). But unlike *Christensen*, there was no finding in this case that Bowers had done anything to actively interfere with Burkhart's relationship with Daughter, let alone any particularized analysis from the court linking the decision to change Daughter's name to any such finding. Moreover, our decision in *Christensen* was ultimately based on the mother's failure to present evidence that a name change was actually in her child's best interest. *Id.* at 626. Our decision today is likewise based on the moving party's failure to carry his burden.

¶44    In sum, "the record contains no evidence that use of [Burkhart] would strengthen the father-child relationship." *Hamby*, 769 P.2d at 279. Instead, the court's ruling on this factor relied on an improper presumption and category-based reasoning. The court's finding that the name change would strengthen Burkhart and Daughter's relationship is thus clearly erroneous. *See id.*

b.    Difficulties, Harassment, or Embarrassment

¶45    The court also considered "whether there could be difficulties, harassment, or embarrassment" to Daughter from bearing either surname. The court noted that it was a "norm" in

Daughter's family for children to bear the father's surname because Bowers's other children bear their fathers' surnames. From this, the court surmised that Daughter may experience "difficulty, harassment and/or embarrassment as to why she is the only child not given her father's last name in this family because it raises the issue of illegitimacy." The court accordingly found that "this factor cuts strongly in favor of" Burkhart.

¶46   In *Hamby*, however, we noted that laws have "been promulgated to eliminate legal distinctions between legitimate and illegitimate children." *Id.* at 277. As in *Hamby*, we have some doubt about whether the specter of illegitimacy is a valid basis for granting a name change in a case like this one. In the current age, there are a variety of family arrangements that might result in children having different surnames than their fathers, thus reducing the danger of anyone drawing any such a conclusion. Short of concluding that a child should always receive the father's surname to avoid the perceived stigma of illegitimacy—a proposed rule that we essentially rejected in *Hamby*—we see no basis for relying on this as a reason for a name change here.

¶47   Aside from the prospect of perceived illegitimacy, Burkhart's appeal to *Hamby*'s "difficulties, harassment, or embarrassment" factor rests on the fact that Daughter's siblings have their own fathers' surnames while Daughter does not. We first note that, no matter what happens in this case, Daughter will always have a different surname than her siblings, so there's always going to be some disconnect between her and her siblings as far as surnames go. But if her name is changed to Burkhart, this will now also mean that she no longer bears the surname of any parent that she lives with. If anything, this might create a new source of potential embarrassment or difficulty for her.

¶48   But more to the point of Burkhart's particular argument, Burkhart again presents no evidence establishing that Daughter will actually suffer any difficulty, harassment, or embarrassment because her siblings share their own fathers' surnames while she does not. The possibility that Daughter's peers will take note of

this comparative connection and be prompted to harass or embarrass Daughter seems small. And again, we stress that while Burkhart bore the burden of proof on this and the other factors, his argument on this front seems based on speculation and conjecture. It's therefore lacking.

¶49    In short, we see no evidentiary support for the court's conclusion that leaving Daughter's name as Bowers would actually result in any difficulty, harassment, or embarrassment to Daughter. As a result, we determine that the court's conclusion regarding this factor is clearly erroneous. *See Christensen*, 941 P.2d at 626 (holding that a factor "cannot be relied on to support a change of surnames" if "there was no evidence presented" relevant to that factor).[6]

c.    Insecurity or Lack of Identity

¶50    The court also found "the possibility that a different last name may cause [Daughter] insecurity and lack of identity" to be "compelling in this case." But the court did not explain what evidence supported this finding, instead simply supporting this conclusion by opining that Daughter was "more likely to have a strong sense of security and identity of who she is on both sides of her family if she is give[n] [Burkhart's] last name and lives full time with [Bowers]."

¶51    The court's explanation again seems to adopt a presumption that a child should share the noncustodial parent's

_____

6. With its finding about the potential difficulties for Daughter, the court "recognize[d] the cultural norm in the United States and around the world that children bear the paternal surname." Although the court stated that this "cultural norm" was only "relevant" because it also seems to be the norm in Daughter's family, we are troubled by the reference. We again remind courts that "lip-service to the best interests of the child should not be used as a subterfuge to nevertheless perpetuate the paternal preference." *Hamby*, 769 P.2d at 278.

surname as a way of compensating for the noncustodial parent having less parent-time. As previously explained, however, such a presumption does not exist and is inconsistent with the best interest analysis. And in this case, there is no evidence establishing that it will cause Daughter any insecurity or lack of identity if she has a different surname than her father. At most, we note Burkhart's vague assertion below that Daughter "should have his last name for religious, genealogy, and family ties." Though somewhat unclear, this assertion appears to be a roundabout way of again appealing to traditional norms under which children were automatically given their father's surname. But as noted, we held in *Hamby* that the "best interests of the child should not be used as a subterfuge to nevertheless perpetuate the paternal preference." 769 P.2d at 278.

¶52 In short, neither the court nor Burkhart have pointed to any facts that are based on non-speculative grounds that would show that Daughter would have increased insecurity or lack of identity if she does not share Burkhart's surname. We accordingly conclude that the district court's finding on this factor was impermissibly based on "pure speculation at best." *Christensen*, 941 P.2d at 626. Without any supporting evidence, we conclude that it was clearly erroneous.

d.  Bowers's Motives

¶53 Finally, the court found that Bowers's "motives or interests are contrary to her position and actions regarding the naming of her other children and [was] therefore concerned that her motive is just to be contrarian."

¶54 Although it is apparently true that Bowers's other children have their fathers' surnames, this particular finding was decidedly comparative—the district court purported to compare Bowers's motives when naming her other children with her motives when naming Daughter. But there is no evidence from which the court could properly assess this. Of note, there is nothing in the record explaining why Bowers's other children

bore their fathers' surnames, nor is there any place in the record where Bowers was asked to explain the discrepancy with respect to Daughter. As with the court's assessment of the other factors, there is accordingly no evidence to support this finding, so we conclude that it was clearly erroneous.[7]

---

7. Three additional things bear some mention here—one tied to this case, and two offered as guidance for future cases that consider the "motives" factor that we identified in *Hamby*.

First, there was some suggestion by Bowers's counsel in the hearing below that Bowers wanted Daughter to have her surname so that Daughter could have a connection to a multi-generational military legacy from Bowers's family. But Bowers did not include this in her declaration, nor did counsel formally proffer this. As a result, there's no evidentiary basis for finding that this was actually her motive.

Second, the court's focus on Bowers's motive alone appears to have been driven by our statement in *Hamby* that courts may examine "the motive or interests of the custodial parent." *Hamby*, 769 P.2d at 277; *see also Christensen v. Christensen*, 941 P.2d 622, 626 (Utah Ct. App. 1997) ("Lastly, the trial court addressed the motives or interests of the custodial parent."); *Velasquez*, 2019 UT App 185, ¶ 15 (agreeing with the district court that there was no evidence that the custodial parent had an "ulterior motive"). *Hamby* drew this factor from an Illinois case, *In re Marriage of Omelson*, 445 N.E.2d 951, 952 (Ill. App. Ct. 1983), wherein the custodial mother moved to change her child's name. *See Hamby*, 769 P.2d at 277. As part of its analysis, *Omelson* considered "whether the mother seeks to advance her own interest in bringing the petition." 445 N.E.2d at 955. But in our view, *Omelson* focused on the mother's motives because she was the moving party, not because she was the custodial parent. *See id.* (detailing the mother's behavior and concluding that "[s]uch machinations serve to render suspect the mother's motives in seeking a change of name for [the child]"). Properly understood, we think it's most appropriately read for the proposition that a court should

(continued…)

consider the motives and interests of the parent who is attempting to change the child's name. And this makes sense. While a child will sometimes have the name of the custodial parent, a child will sometimes have the name of the noncustodial parent. Since the question at issue turns on the advisability of changing the child's name, it's therefore unclear why this factor would turn on the motives of the custodial parent. If anything, the most natural starting place is to look at the motives of the parent who is asking for the name change.

But even so, having considered the matter anew, we don't regard this factor as being limited in even this respect. The ultimate question turns on the best interest of the child, and in considering that, all relevant facts should be considered. Given the broad nature of this inquiry, we now clarify that, to the extent that parental motives are relevant, a court might start by examining the motives of the moving parent (who is, after all, the proponent of change). But in appropriate circumstances, a court might also consider the motives of the non-moving parent too.

Finally, we note with approval decisions from some other courts that have considered whether a parent has previously spent time with the child, paid child support, or otherwise been engaged in the child's life. *See, e.g.*, *Cohee v. Cohee*, 317 N.W.2d 381, 384 (Neb. 1982) (considering "[f]ailure to support the child" and "[f]ailure to maintain contact with the child"); *In re Newcomb*, 472 N.E.2d 1142, 1145 (Ohio Ct. App. 1984) (stating that courts may consider whether a parent "fails to support, abandons the child, [or] is and has been indifferent to the child's welfare"); *Keegan v. Gudahl*, 525 N.W.2d 695, 699 (S.D. 1994) (stating that courts may consider "failure to support the child" and "failure to maintain contact with the child").

To be clear, we explained above that it is inappropriate for a court to use a child's name as a tool for incentivizing good parenting behavior moving forward. But to the extent that this factor looks to the parent's motives for making or opposing the motion to change the child's name, we acknowledge that a court could appropriately consider a parent's past behavior as an

(continued…)

CONCLUSION

¶55 Burkhart bore the burden of establishing that it was in Daughter's best interest to have her name changed. While the district court considered four of the *Hamby* factors, the court's finding on each factor was not supported by sufficient evidence. We therefore conclude that there was insufficient evidence to establish that Burkhart carried his burden of proving that the name change was in Daughter's best interest. We accordingly reverse and remand for entry of an order consistent with this opinion.

———————

indicator of that parent's motives at that time. To illustrate with an example from just one side of a potential dispute: if a parent has previously failed to be appropriately engaged in the child's life (such as by not participating in the child's life or paying any child support obligations), and yet that parent is now requesting a name change, a court could regard the parent's past indifference as an indication that the name-change request is motivated by the parent's own self-interest, as opposed to the child's best interest.